UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHAYNES REEDA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>T. L. HOM, et al.,<br><br>　　　　　Defendants. | No.  2:12-cv-2773 CKD P<br><br><br>ORDER |

I. Introduction

     Plaintiff, a state prisoner proceeding pro se, has filed this civil rights action seeking relief under 42 U.S.C. § 1983.  This action proceeds on the complaint filed November 9, 2012, in which plaintiff alleges that defendants Camp, Hom, and Vielbig failed to protect him from harm in violation of the Eighth Amendment.  (ECF No. 1 ("Compl."))  Pending before the court is defendants' February 9, 2014 motion for summary judgment (ECF No. 27), which has been briefed by the parties (ECF Nos. 38, 39).  The parties have consented to this court's jurisdiction pursuant to 28 U.S.C. § 636(c) and Local Rule 302.  (ECF Nos. 4, 17.)  For the reasons discussed below, the undersigned will grant defendants' motion.

II. Summary Judgment Standards Under Rule 56

     Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

1   Civ. P. 56(a).  A party asserting that a fact cannot be disputed must support the assertion by

2   "citing to particular parts of materials in the record, including depositions, documents,

3   electronically stored information, affidavits or declarations, stipulations (including those made for

4   purposes of the motion only), admissions, interrogatory answers, or other materials. . ."  Fed. R.

5   Civ. P. 56(c)(1)(A).

6   　　　Summary judgment should be entered, after adequate time for discovery and upon motion,

7   against a party who fails to make a showing sufficient to establish the existence of an element

8   essential to that party's case, and on which that party will bear the burden of proof at trial.  See

9   Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[A] complete failure of proof concerning an

10  essential element of the nonmoving party's case necessarily renders all other facts immaterial."

11  Id.

12  　　　In the endeavor to establish the existence of a factual dispute, the opposing party need not

13  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

14  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

15  trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

16  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

17  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

18  amendments).

19  　　　In resolving the summary judgment motion, the evidence of the opposing party is to be

20  believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the

21  facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475

22  U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

23  obligation to produce a factual predicate from which the inference may be drawn.  See Richards

24  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

25  (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

26  simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

27  taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

28  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

III. Analysis

A. Facts

In determining whether summary judgment is appropriate, the court considers the following record facts:

The Incident

On September 7, 2010, plaintiff, a Black inmate, was incarcerated at California State Prison-Sacramento ("CSP-Sac."). (DUF 1; Reeda Depo, 35:5-7.) He was housed on Facility C, Building 5, Section C, cell 225.[1] (Id.) He worked as a Tier Tender in Building 5. (DUF 2.)

Facility C was a general population yard. (DUF 4.) Prior to September 7, 2010, Facility C had been on lockdown or modified programming for approximately two months due to ongoing fighting between Black and Northern Hispanic inmates. During this period, inmates were confined to their cells. (Reeda Dep., 30:13-31:9.) On September 7, 2010, Facility C recently had been returned to "normal" programming.[2] On normal program, there were set times for the release of inmates for school, work, and yard. (DUF 5.) Also, individual inmates could be released for specific approved reasons, such as medical appointments. (Id.)

That day, defendant Hom was the control booth officer and defendants Camp and Vielbig were floor officers for Building 5. (DUF 3.) Hom's responsibilities included electronically opening and closing the building, section, and cell doors from the control booth. (Hom Decl. ¶ 3.) Camp's and Vielbig's responsibilities included conducting pat-down searches of inmates as they were released for or returned from educational, vocational, or recreational programs. (Camp

---

[1] Building 5 is a 180-design, meaning the building is configured in a half circle and divided into three separate living areas (Sections A to C), where a total of up to 120 inmates are celled. The sections are separated by concrete walls with doors leading to adjacent sections. Outside the main section doors, there is a hallway leading to the yard and other areas where various offices are located; this is known as the "rotunda." The control booth, which is on the second level, has a view into all three sections. In addition, the floor of the control booth has windows that look into the rotunda. (Hom Decl. ¶ 3.)

[2] While at least one document in the record indicates that September 7, 2010 was the first day of normal programming in C facility after the modified program was lifted (Compl. at 41; see also Reeda Depo. 32:6-8.), other documents suggest that normal programming resumed on August 23, 2010. (ECF No. 27-7 at 2; see Reeda Depo, 32:9-12.)

3

Decl. ¶ 2; Vielbig Decl. at ¶ 2.)

In his verified complaint[3], plaintiff alleges as follows:

> [On September 7, 2010, at approximately 0600 hours, plaintiff] was released for work as a 2nd Watch C Facility 5 Block Porter.
>
> Defendant Hom electronically released plaintiff from his quarters (cell). Plaintiff proceeded to the dining hall door to retrieve coffee and lunches for distribution to inmates in their cells in C5. Plaintiff then assisted defendants Vielbig and Camp in the distribution of the morning (breakfast) meal to inmates in unit C5. Upon completion of this process, the plaintiff sat down at a table in one of the day room sections to eat his breakfast tray meal.
>
> [After breakfast], he then proceeded to collect the empty trays and trash from inmates in their cells, in each section. Once plaintiff finished this task, defendant Hom directed plaintiff to take the trash outside, then Hom electronically opened the C5 main entrance and exit door for the plaintiff. Plaintiff then began to take outside the unit, several bags of trash.
>
> As plaintiff was taking out the trash, he noticed several inmates walking out of the housing unit (C5) in a rushed fashion. There were no staff (defendants Vielbig nor Camp) standing outside the unit, nor were they in the rotunda to conduct the required pat search and frisk, as well as the metal-detector wanding of inmates exiting the unit.
>
> As plaintiff walked back into the C5 rotunda after . . . taking the trash outside, plaintiff noticed that there were several hispanic [sic] inmates lingering/loitering in the rotunda as plaintiff was proceeding into C section to continue his job duties.
>
> Then suddenly plaintiff heard the hispanics [sic] that were loitering in the rotunda run into C section, running up behind plaintiff, and they began to assault and stab him numerous times.
>
> As the attack and assault ensued, neither defendant Camp nor Vielbig were around, and the plaintiff continually assaulted and stabbed by the assailants [tried] to defend himself. The shock and effort to yell for help was thwarted by the stabbings to plaintiff's neck area. The coordinated assault continued for quite a while. When defendant Hom became aware of the incident . . . he notified the floor staff and activated an alarm.
>
> . . . [The attack] culminat[ed] in several serious injuries, necessitating transport by ambulance to an outside community hospital for emergency room procedures.

---

[3] When a complaint is verified under penalty of perjury, it has the effect of an affidavit to oppose summary judgment "to the extent it is 'based on personal knowledge' and 'sets forth specific facts admissible in evidence.'" Keenan v. Hall, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996).

(Compl. ¶¶ 29-36.)

Similarly, plaintiff testified in his deposition that while he was outside dropping off the trash, approximately twenty inmates walked out of the housing unit. Yet there were no floor officers lined up outside of the housing entrance to search inmates as they left the building on work release, as was the usual practice. (Reeda Depo, 39:9-41:6.) When plaintiff entered the building, there were four inmates in the rotunda, and the doors to both the A-section and C-section housing wings were open; plaintiff could not see the B section door. (Id., 41:13-42:7.) Plaintiff entered C-section to start cleaning the showers, which was one of his duties. As soon as he stepped into C-section, he heard footsteps running behind him. Inmates Herrera and Rodriguez then attacked him in the dayroom of C-section. (Id., 42:14-44:16.)

At approximately 7:40 a.m., Hom saw inmates Herrera and Rodriguez attacking plaintiff in the C-section dayroom. He activated his alarm and yelled to floor staff that there was a fight. Camp and Vielbig were in the Building 5 office, preparing for pat-down searches. They heard the alarm and responded to the C-section dayroom, about fifteen feet away. Plaintiff had blood on him and was backing away from the other two inmates. Camp and Vielbig ordered Herrera and Rodriquez to get down, and when they did not comply, sprayed them with pepper spray. Hom fired a single shot round from a 40 mm launcher, hitting neither inmate. (DUF 15.) Within one or two minutes, Herrera and Rodriguez were subdued and handcuffed. (DUF 8-19.) Medical staff arrived and plaintiff was immediately treated and taken to the prison hospital on a gurney. (DUF 20.)

The report documenting this incident stated in part:

> On Tuesday, September 7, 2010 at approximately 0740 hours, Inmates HERRERA . . . and RODRIGUEZ . . . attempted to murder REEDA . . . with inmate manufactured weapons while in the C 5 block C-section dayroom, resulting in the use of force by responding staff to stop the incident.
>
> . . .
>
> The two weapons . . . appeared to be manufactured from extruded aluminum, one measuring approximately 5 1/4 inches long by 3/4 inch wide, the other measuring approximately 4 3/4 inches long by 3/4 inch wide. Each weapon was sharpened to a point at one end, with what appeared to be some sort of melted black plastic covering

5

>approximately 2 inches on the opposite end for a handle. Officer Camp observed a great deal of blood on REEDA and notified medical staff . . .
>
>. . .
>
>REEDA sustained the following injuries. . . : three puncture wounds to his upper left back, punctures to upper left and lower right chest. Lacerations to right side of neck, hands, head, and both shoulders.

(Compl. at 62.) Plaintiff sustained a total of 14 stab wounds. (Reed Depo., 49:3-5.)

The next day, a memorandum was issued to C-facility staff and inmates stating:

>Due to Attempted Murder of an inmate, which occurred in C-5 Block on September 7, 2010, at approximately 0740 hours, involving Black and Northern Hispanic Inmates, all Black and Northern Hispanic inmates, housed in Blocks 5-8, and those celled with them, as well as those inmates associated with Black and Northern Hispanic disruptive groups are on Modified Program status until further notice.

(Compl. at 28.) In this return to modified programming, affected Black and Northern Hispanic inmates were barred from work, education, and yard time. (Id.)

Prior to the September 7, 2010 incident, plaintiff had no safety concerns about being around Northern Hispanics, nor had he reported any such concerns to Hom, Camp, or Vielbig. While he "knew of" inmates Herrera and Rodriguez "just from being the building tier tender," he had had no problems with them prior to that day. (Reeda Depo., 35:14-36:12.) All three defendants declare that, prior to this incident, they had no knowledge that Hispanic inmates intended to attack Black inmates such as plaintiff. (DUF 22.)

Release Procedures

Prior to September 7, 2010, defendant Hom had been the Control Booth officer in Facility C for approximately two months. (Reeda Dep., 28:24-29:6.) In deposition, plaintiff testified as follows:

>Q: And, again, before September 7th, 2010, . . .[h]ow were inmates released? . . . [O]n a normal day, how were they released for education or yard?
>
>A: Um, well, first let me sort of explain it a little. Maybe it's clearer for you. Let me go back. Um, the control officer, control booth CO Hom, he had just started working in the control booth in

5 building, but before him there was another regular, and he used to announce that, you know, ten minutes to work release or ten minutes to yard, and he'll put us, the porters, in a section and tell us to wait; you know, wait in the section and close the door because he's about to do his release.

So once release is announced . . . through the PA system . . . they would close all the section doors. They will have all the main section doors closed and the side pocket doors, and the CO's would be out in front of the building like the floor staff, and the control towers will release like whichever section he start with. He may start with A-section. He will release A-section first for the ones that are assigned to work or school or whatever. . . . Once A-section is released, he will go to B-section, release B-section, and from there C-section; and once, you know, all of them are released and searched through going out the housing unit, he'd open back up the doors for us and let us continue our work.

. . .

Q: Okay. So during the two months before September 2010, did [Hom] pretty much follow the same procedure that you had – that [previous Control Booth] Officer Swoops had used before he left Building 5?

A: Pretty much, yes.

Q: After Officer Hom started, did you feel that there was a drastic change in the procedure of how inmates were released during education and work programs?

A: I wouldn't say it was a drastic change, but maybe a subtle change, I would say.

Q: And what about the difference in the way Officer Hom released inmates compared to Officer Swoops did you notice?

A: Well, I guess it was more of a – you know, more of a warning like more of an advanced warning that he's about to release – release the inmates for whichever they've got to do, and that was CO Swoops. Hom, he never really gave that much of a warning, from my [per]spective.

Q: Okay. Did Officer Hom also require you and the other porters to go to a specific section while another section was being released for work and education?

A: Um, I can't – I can't really say that he did because . . . from the time he started until the incident . . . you know, we'd been on lockdown, so our, you know, our assignment, our working assignments, you know, we really didn't get a chance to perform out duties up under his supervision. So I couldn't say that he did do that or he didn't.

(Reeda Depo, 27:7-30:6.)

7

As to floor officers Camp and Vielbig, plaintiff testified in deposition that he believed they failed to follow prison "procedures and policies" when they were not present to search the inmates as they were released from the housing units for work and education. (Reeda Depo, 56:24-57:4.) In plaintiff's view, if the floor officers had been "in a position to search the inmates, there wouldn't have been no inmates . . . loitering or lingering inside the rotunda"; rather, they would have been "shooed out" or moved out of the building to "where their assignments were." (Id., 57:5-19.)[4]

Defendants explain the inmate release procedure for Facility C as follows:

During the release of inmates for scheduled programs or appointments, officers from adjoining housing units reported to the front of one building and assisted with the required pat-down searches to expedite the release of inmates. To avoid inmates from crowding the rotunda during a scheduled release or to prevent inmates from exiting the building without being searched, the control booth officer staggered the release of inmates, meaning only a limited number of inmates were released from their cells at a time. (DUF 6.) However, if a scheduled release affected a small number of inmates, the control booth officer released all the affected inmates into the rotunda before the officers formed outside the housing unit. (DUF 7.)

It was possible for an inmate to return into the building during a scheduled release without Hom's knowledge because his attention was focused on the inmates he was releasing. Also, there were "blind spots" in the rotunda where an inmate could avoid detection by the control booth

---

[4] Plaintiff submits with his opposition a copy of Post Order #277031, which outlines the duties of a C Facility 5 Block Floor Officer. (ECF No 38 at 42-45.) These include:

> Oversee all Inmate Releases and Recalls (Yard, Education, Work line, etc) from Housing Units[,] ensure that all lines are conducted in a proper manner. . . . The inmates will be scanned with a metal detector and you will conduct a clothed pat down search. Any items in the inmate's possession will also be searched. Yard Releases and Recalls will be conducted per the current C Facility Yard Schedule.

(Id. at 44.) See also Department Operations Manual (updated January 1, 2014) § 52020.7 ("All scheduled work/training program releases shall be announced to the general population. Inmate movement to and from assignments shall be supervised along established routes.")

1 officer. (Hom Decl. ¶¶ 10-11.)

2 On September 7, 2010, at approximately 7:40 a.m., Hom started the scheduled release of Northern Hispanic inmates who were headed to Sally Port Education. (DUF 8.) Because there were only about ten inmates affected by this scheduled educational release, Hom released all the inmates into the rotunda area of Building 5[5], while Camp and Vielbig were in the Office preparing for pat-down searches. (DUF 9.) As he "walked back to the C-section control panel," Hom saw Herrera and Rodriguez fighting with plaintiff in the C-section dayroom, and activated his alarm. (Hom Decl., ¶ 12.) To the best of Vielbig's recollection, when Hom announced the fight, floor officers had not yet lined up outside the building to conduct the required pat-down of released inmates. (Vielbig Decl. ¶¶ 22, 26.)

B. Legal Standard

The Eighth Amendment's prohibition on cruel and unusual punishment imposes on prison officials, among other things, a duty to "take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1991) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). "'[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners.'" Id. at 833. "[A] prison official violates the Eighth Amendment when two requirements are met. First, the deprivation alleged must be, objectively, 'sufficiently serious'[.] For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." Id. at 834. Second, "[t]o violate the Cruel and Unusual Punishments Clause, a prison official must have a 'sufficiently culpable state of mind' ... [T]hat state of mind is one of 'deliberate indifference' to inmate health or safety." Id. The prison official will be liable only if "the official knows of and disregards an excessive risk to inmate health and safety; the officials must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.

////

---

[5] Camp and Vielbig similarly put the number of released inmates at around ten. (Camp Decl. ¶ 19; Vielbig Dec. ¶ 25.)

9

C. <u>Discussion</u>

Defendants assert that plaintiff has failed to establish a genuine dispute of material fact as to whether they were deliberately indifferent to plaintiff's safety on September 7, 2010. Making all reasonable inferences in plaintiff's favor, the court summarizes the record facts in light of the applicable legal standard:

On September 7, 2010, plaintiff was fulfilling his job duties as a tier tender (or porter) in Building 5. For the past two months, the facility had been on lockdown due to fighting between Black and Northern Hispanic inmates, and September 7 was the first day – or one of the first days – in which inmates were being released for education and work per the normal program. Typically, when inmates were about to be released for work and education, the control booth officer would alert the porters and wait until they were in a secured section of the prison before opening the doors to release the inmates from the housing units, one unit at a time. Also typically, and per prison policy, floor officers would be in place to pat down the released inmates in an orderly fashion and direct them outside the building and to their assignments.

Neither of these things happened on September 7, 2010. The control booth officer, Hom, had only held that position for approximately two months, during which the facility had been on lockdown. Because only about ten Northern Hispanic inmates were scheduled for educational release, Hom released them all at once, rather than one housing unit at a time. Prior to this release, he did not make a warning announcement to plaintiff or ensure that plaintiff was in a secure area of the prison – despite the fact that plaintiff was Black and thus a potential target for Northern Hispanic violence. Nor did Hom wait for the floor officers to be in position to pat down the released inmates for weapons and direct them outside the building.

As a result, while Hom was busy releasing other inmates, a small number of Northern Hispanic inmates were able to "loiter" in the rotunda area. Two of these, Herrera and Rodriguez, possessed inmate-manufactured weapons. They followed plaintiff into the C-section dayroom and attacked him, stabbing him fourteen times before floor officers Camp and Vielbig were able to rush in and stop them.

/////

To show a defendant had a culpable state of mind under the deliberate indifference standard, a plaintiff must show that the defendant was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and he must also [have drawn] the inference." Farmer, 511 U.S. at 837. Here, plaintiff has raised facts from which defendant Hom could have drawn the inference that his actions – specifically, releasing the Northern Hispanic inmates without warning plaintiff, securing his safety, or waiting for the floor officers to be in place, all in the context of recent racial violence – put plaintiff at substantial risk of serious harm.

However, plaintiff has presented no evidence that Hom actually drew the inference. Plaintiff had given Hom no reason to believe that he feared, or was at particular risk of, an attack by Northern Hispanic inmates. Moreover, Hom reacted swiftly to stop the attack on plaintiff as soon as he became aware of it. Similarly, Camp and Vielbig quickly rushed in to bring the attackers under control and summon medical aid for plaintiff.[6] See Robertson v. Cusak, 2007 WL 1795708, *5 (N.D. Cal. June 20, 2007) (control booth officer who failed to follow release procedure, resulting in race-based attack on plaintiff, was entitled to summary judgment on deliberate indifference claim). As the Supreme Court has made clear, negligence and even gross negligence are not enough to amount to an Eighth Amendment violation. Farmer, 511 U.S. at 835-836, n. 4. Nor does a prison official's violation of a prison rule or administrative regulation, without more, amount to a federal constitutional violation. Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997) ("To the extent that the violation of a state law amounts to the deprivation of a state-created interest that reaches beyond that guaranteed by the federal Constitution, Section 1983 offers no redress."). Thus, on the record before the court, defendants are entitled to summary judgment.

////

////

---

[6] Because Camp and Vielbig were preparing to conduct pat-downs at the time of the attack and had no control over when inmates were released, plaintiff has not raised a triable issue of fact as to whether these defendants acted with deliberate indifference.

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment (ECF No. 27) is granted; and
2. The Clerk of Court shall close this case.

Dated: August 14, 2014

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

2 / reed2773.sj